In the Supreme Court of Georgia

Decided: September 22, 2014

S14A1109. PERERA v. THE STATE.
S14A1110. ALMA v. THE STATE.

MELTON, Justice.

Following a joint jury trial regarding the murder of Robert Scott Burdette

and the related arson committed by burning Burdette's car with his body inside,

co-defendants Emily Margaret Perera[1] and Miguel Angel Alma[2] appeal their

---

[1] On August 11, 2006, Perera was indicted for murder and two counts of arson. Following a joint trial with Alma, Perera was found guilty on all counts, and, on December 15, 2008, the trial court sentenced her to life imprisonment for murder and twenty consecutive years for one count of arson. The second count of arson was merged for purposes of sentencing. Perera filed a motion for new trial on December 19, 2008, which she amended on August 6, 2013, October 1, 2013, and October 9, 2013. The motion was denied on November 22, 2013. Thereafter, Perera filed a timely notice of appeal, and her case, submitted on the briefs, was docketed to the April 2014 Term of this Court.

[2] On August 11, 2006, Alma was indicted for murder and two counts of arson. Following a joint trial with Perera, Alma was found guilty on all counts, and, on December 15, 2008, the trial court sentenced him to life imprisonment for murder and twenty consecutive years for one count of arson. The second count of arson was merged for purposes of sentencing. Alma filed a motion for new trial on December 15, 2008, which he amended on May 22, 2013. The motion was denied on November 22, 2013. Thereafter, Alma filed a timely

convictions, contending, among other things, that the evidence was insufficient to support their verdicts and that respective trial counsel rendered ineffective assistance. For the reasons set forth below, we affirm in both cases.

In the light most favorable to the verdicts, the record shows that, on the night of May 1, 2006, police officers in Douglas County discovered Burdette's body in the back seat of his burning car. Burdette had been gagged with duct tape, and an electrical cord was wrapped around his neck. In addition, he showed signs of blunt force injuries to his head and bruising on his face. An investigator with the Georgia Insurance and Safety Fire Commissioner's Office concluded that the fire was intentionally set by dousing the interior of Burdette's car with gasoline and setting it ablaze.

The investigation next led to Burdette's house in Bartow County. There, officers found direct evidence of a violent struggle. Investigation showed that an attack began in the master bedroom and continued to the garage. The GBI determined that there was no evidence indicating whether Burdette was alive or dead when he was taken from his home. Bloody water was discovered in a sink,

notice of appeal, and his case, submitted on the briefs, was docketed to the April 2014 Term of this Court.

along with bloody mops and hazy floors indicative of cleaning with bleach. In the garage, there was more blood, bloody towels, bloody carpet remnants, and an electrical cord. In addition, a woman's bracelet was also found in a puddle of blood. One of the two garage bays was empty, and there was a Land Rover SUV in the other. Computer equipment and a TruTech DVD player were missing from the house. Nineteen days after Burdette's murder, Alma pawned a TruTech DVD player and attempted to pawn a Super-8 video camera. Perera admitted to her friend, Johnny Large, that she and Alma had tried to pawn some of the victim's possessions.

Continuing the investigation, police uncovered previous emails between Burdette and Perera, who was known on an internet dating site as "Sexy Sophie." The emails indicated that Burdette and Perera had a dating relationship, and in one communication, Perera asked if she could get her bracelet back that she had left at Burdette's house. Further investigation also showed that Perera's cell phone "pinged" off the cell phone tower closest to Burdette's house on the night of Sunday, April 30, 2006 and, on May 1, 2006, also pinged off the cell phone tower across the street from where Burdette's car was set on fire. When law enforcement questioned Perera about her whereabouts on the Sunday and

3

Monday when Burdette was killed, Perera said she was in another part of town with Alma, who was her boyfriend.

Miguel Morales, a.k.a. "Cheekie," told investigators that, a week before the murder, Alma told him they should rob a wealthy man whom Perera was dating. Approximately a week later, Alma called Morales during the early morning hours, told Morales that he had killed a man, and offered Morales $2,000 to assist in disposal of the body. Later that day, Alma called Morales and asked if he knew someone who would want to purchase a Land Rover. Perera also called Morales and told him that Alma made a car explode. After Perera's call, Alma called Morales again and bragged that he was a specialist in making cars explode. A few days after these conversations, Alma met with Morales and showed him a number of items that he had stolen during the burglary, including watches, a camera, and a wooden box with a gun inside. Alma also informed Morales that he had computer equipment that he wanted to temporarily store in Morales's apartment. Alma also admitted to Morales that he had strangled the victim and that he and Perera had cleaned the house with bleach to erase fingerprints.

To further advance their investigation, police used a wiretap. During the

4

span of the wiretap, police gathered only limited evidence. However, Perera did tell Alma that they needed to meet up because law enforcement had been "harassing" her. Perera also told Alma that she did not owe him more money because he had already received the watch, computers and prior compensation.

Law enforcement later obtained search warrants for Perera's house as well as Alma's apartment. The search of Perera's home uncovered a book bag containing two humidors, a loaded 9-mm semi-automatic pistol inside one humidor, a Super 8 video camera, a digital camera, and a hand-drawn map of Burdette's residence containing written information on the plot to commit the crimes. A GBI forensic handwriting expert opined that both Perera and Alma created the map. Law enforcement also recovered a shipping box that was sent to Perera that contained a man's watch, as well as a police scanner and Alma's wallet. Burdette's ex-wife identified the two humidors and the watch as being the possessions of Burdette. The digital camera was also Burdette's, and the memory card in the camera contained photographs of Burdette while he was alive, as well as pictures of both Perera and Alma that they took after Burdette's death.

The day after the search of Perera's home, Perera and Alma were arrested.

While Perera and Alma were incarcerated and awaiting trial, they continued to communicate in letters. After being tipped off by a fellow inmate, law enforcement obtained a search warrant for Perera's jail dormitory. They found letters from Perera to her husband, Charles Astfalk. In these letters, Perera describes her version of her alibi during the weekend that Burdette was murdered. Perera instructs her husband to memorize her story and tell the police he was with her the whole time. Perera states that, under her plan, Alma will plead guilty, take a lesser sentence, and exonerate her. Perera also writes that, if Alma does not go along with her plan, she will have to kill him. Perera also wrote letters to Alma, encouraging him to go along with her plans.

This evidence was sufficient to enable the jury to find Perera and Alma guilty of the crimes for which they were convicted beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Case No. S14A1109

1. Nonetheless, Perera contends that the State failed to prove venue for the murder charge was proper in Douglas County, where her case was tried. She maintains that the only evidence available to the jury was that Burdette was murdered in his Bartow County home, and, as a result, venue had to be set in

6

that county. The record belies this contention.

While there was some evidence that Burdette had been viciously attacked and possibly killed in his home, the State medical examiner testified that Burdette died of strangulation, not blood loss, and it could not be determined whether death occurred in his Bartow County residence. This situation is covered by OCGA Section 17-2-2 (c), which provides:

> Criminal homicide shall be considered as having been committed in the county in which the cause of death was inflicted. If it cannot be readily determined in which county the cause of death was inflicted, it shall be considered that it was inflicted in the county in which the death occurred. If a dead body is discovered in this state and it cannot be determined in what county the cause of death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered.

Burdette's body was discovered in Douglas County, and the county in which the cause of death was inflicted could not be determined. Therefore, venue was appropriate in Douglas County. Id.

2. Perera argues that the trial court erred by failing to grant her motion to sever her trial from Alma, contending that her case was harmed by evidence that Alma pawned a DVD player taken from Burdette's home following the murder.

> [A] trial court has broad discretion to grant or deny a motion for severance. See OCGA § 17–8–4 [Cit.] In ruling on a severance

7

motion, the trial court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

Krause v. State, 286 Ga. 745, 749 (5) (691 SE2d 211) (2010). "The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing [that a joint trial would lead to] prejudice and a consequent denial of due process." (Footnote omitted.) Character v. State, 285 Ga. 112, 118 (5) (674 SE2d 280) (2009) (punctuation and footnote omitted).

Perera argues only that the cases should have been severed due to the evidence of the pawned DVD player. Given the extensive nature of the evidence tying Perera to Burdette's murder, including all of the items found in Perera's home, she has wholly failed to show that her defense was prejudiced by this evidence and, as a result, has not shown that the trial court abused its discretion by denying her motion to sever. Krause, supra.

3. Perera contends that her trial counsel rendered ineffective assistance by failing to: (a) object to offensive racial remarks made by the prosecutor in opening statements; (b) object to the admission of a number of provocative

photographs; (c) make a proper motion to suppress statements made by Perera to law enforcement; and (d) make a motion to suppress evidence obtained during a wiretap.

> In order to succeed on [her] claim of ineffective assistance, [Perera] must prove both that [her] trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. Strickland v. Washington, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong. Id. at 697 (IV); Fuller v. State, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's decision, "'[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Wright v. State, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

(a) Perera argues that trial counsel rendered ineffective assistance by failing to object to racial comments made by the prosecutor during opening statements. In addition, Perera takes issue with the prosecutor's decision to characterize her as "stupid" or a "mooch." Perera ultimately argues that all of these statements were made as part of a prosecutorial scheme to portray all Mexicans, and Perera specifically, in a negative light. A review of the transcript, however, reveals no evidence of any such scheme, and Perera's argument to the

9

contrary lacks merit. In any event, Perera failed to show how she was harmed by any of the allegedly offensive statements, a number of which were directed at one of the State's *own* witnesses, not Perera.

(b) Perera contends that trial counsel rendered ineffective assistance by failing to object to a large number of photographs which she contends were unduly provocative. The record shows, however, that the photographs were associated with online dating sites frequented by Perera and through which Perera began communicating with the victim. These photographs were both relevant and admissible to show the manner in which Burdette and Perera met and the nature of their relationship. As a result, trial counsel did not render ineffective assistance by failing to object to this admissible evidence. "There is no deficient performance when an attorney fails to object to admissible evidence." (Citation omitted.) Poole v. State, 291 Ga. 848, 857 (8) (734 SE2d 1) (2012).

(c) Perera next maintains that trial counsel rendered ineffective assistance by failing to successfully move to suppress certain statements she made at the police station while her car was being searched. When asked what she was doing on the date of Burdette's murder, Perera said that she, Alma, and her daughter

10

were driving around looking for a pharmacy. Perera then presented a receipt showing her whereabouts on April 1, 2006. When confronted about the discrepancy in the date (because the murder was on May 1), Perera grabbed the receipt and accused the investigator of lying. Perera now contends that this statement was inadmissible because she had not been informed of her Miranda rights, and that her trial counsel was ineffective for failing to convince the trial court to suppress the statements on this basis.

The record, however, supports the trial court's determination that Perera's statement was not made during a custodial interrogation subject to Miranda protection. At all times during the questioning, Perera was free to leave, and, in fact, she did leave when she became irritated with law enforcement. Because her car was being searched, Perera called her husband, who picked her and her daughter up from the sheriff's office. No one prevented Perera from leaving, contrary to her contentions. As such, she was not in custodial interrogation subject to Miranda warnings, see, e.g., Leslie v. State, 292 Ga. 368 (4) (738 SE2d 42) (2013), and her attorney was not ineffective for failing to argue otherwise.

(d) Finally, Perera contends that trial counsel was ineffective for failing

11

to move to suppress evidence obtained from the wiretap, arguing that the superior court granting the wiretap authorized it to occur outside of its judicial circuit, in contravention of Luangkhot v. State, 292 Ga. 423 (736 SE2d 397) (2013).[3] Luangkhot states that "in the absence of any state statute expressly granting superior courts the authority to issue wiretap warrants that apply outside their own judicial circuits, we hold that current state law vests the authority to issue wiretap warrants only in those superior courts of the judicial circuits in which the tapped phones or listening post are located." Id. at 427 (4). Luangkhot, however, was decided in Georgia *after* Perera had already been tried.

> [I]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law, and . . . only in a rare case would it be ineffective assistance by a trial attorney not to make an objection that would be overruled under prevailing law." Rickman v. State, 277 Ga. 277, 280 (2) (587 SE2d 596) (2003). And [a]lthough this Court has held that [a new decision] applies to the admission of evidence in cases pending on direct review at the time that opinion was issued, that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, [a new decision] does not apply in a manner that would require counsel to argue

---

[3] Trial counsel did file a motion to suppress, just not on this basis.

beyond existing precedent and anticipate the substance of the opinion before it was issued.

(Citations and punctuation omitted.) Redwine v. State, 280 Ga. 58, 62–63 (3) (c) (623 SE2d 485) (2005). Contrary to Perera's contention, trial counsel was not ineffective for failing to anticipate the decision in Luangkhot.

Case No. S14A1110

4. Like Perera, Alma contends that the evidence was insufficient to support the verdict of murder because the State failed to prove that venue was proper in Douglas County. For the same reasons discussed in Division 1, supra, this argument fails.

5. Alma also contends that the trial court erred by failing to sever his trial from Perera's, arguing specifically that his defense was harmed by the introduction of jailhouse letters written to him by Alma. However, these letters would have been admissible against both defendants, even if they had been tried separately, because Alma and Perera were part of a criminal conspiracy, and the criminal project was still ongoing at the time the letters were written. Alma argues that the conspiracy was over because he was incarcerated. However, "a conspiracy or the concealment phase of it does not end just because one or more

13

participants have been arrested and jailed." (Footnote and punctuation omitted.) Brooks v. State, 281 Ga. 14, 16-17 (2) (635 SE2d 723) (2006). If incriminating statements are made to law enforcement by any of the co-conspirators, it is likely that the conspiracy has ended. Id.; Crowder v. State, 237 Ga. 141 (227 SE2d 230) (1976). But if the incriminating statements are made "while [the] participants [a]re still hiding their identities from the police," they are "made during the concealment phase of the conspiracy, and [a]re admissible against all defendants," even if the co-conspirators are incarcerated. Brooks, 281 Ga. at 16-17 (2). In any event, given the voluminous evidence linking him directly to Burdette's murder, Alma has failed to show that he was harmed by the trial court's denial of his motion to sever. See, e.g., Walker v. State, 282 Ga. 703 (3) (653 SE2d 468) (2007).

6. Alma contends that trial counsel rendered ineffective assistance by failing to: (a) make a motion to suppress evidence obtained through a wiretap; (b) make a motion to suppress evidence found after a search of Perera's home; and (c) provide any defense to the charges of arson and, instead, rely on the sole defense of venue to the murder charge.

(a) For the same reasons that Perera's identical contention fails, see

14

Division 3 (d), supra, Alma's argument that trial counsel rendered ineffective assistance by failing to argue the wiretap violated the requirements of Luangkhot v. State, supra, lacks merit.

(b) Alma argues that trial counsel rendered ineffective assistance by failing to successfully move to suppress all incriminating evidence belonging to him that was found in Perera's home.[4] Alma contends that trial counsel should have argued that he had standing to challenge the search of Perera's home because he was her boyfriend, stayed there frequently, and, as a result, had a protected right to privacy in the residence. It was trial counsel's understanding, however, that Alma did not stay at Perera's home frequently, and, therefore, Alma fails to prove that trial counsel was deficient for not pursuing the motion to suppress the search of Perera's house, given this understanding. See, e.g., Lawton v. State, 285 Ga. App. 45 (645 SE2d 571) (2007).

(c) Finally, Alma contends that trial counsel rendered ineffective assistance by failing to provide any defense to the charges of arson and, instead, relying on the sole defense of venue to the murder charge. At the motion for new

---

[4] The record shows that trial counsel did, in fact, file a motion to suppress but did not raise the arguments identified by Alma on appeal.

trial hearing, trial counsel testified that he chose to focus on the murder charge because it was the most serious defense. Furthermore, the record shows that, contrary to Alma's argument, his trial counsel did, in fact, provide a defense to the arson charges, as he vigorously cross-examined investigators and thoroughly argued that Alma did not commit any of the crimes with which he had been charged. Therefore, the record does not support Alma's contention that trial counsel abandoned any and all defense to the crimes of arson.

Judgments affirmed. All the Justices concur.